Thomas G. STUART, Plaintiff,

v.

William COLLINS and Warner Brothers Records, Inc., Defendants.

No. 77 Civ. 1662 (PNL).

United States District Court,
S. D. New York.

May 7, 1980.
As Corrected June 2, 1980.

Stephen B. Judlowe, New York City, for plaintiff.

Robert C. Osterberg, New York City, for Collins.

Eugene L. Girden, New York City, for Warner Bros. Records.

## MEMORANDUM ORDER

LEVAL, District Judge.

Thomas G. Stuart, a little known performer of popular, rock music brought this action alleging infringement of his service mark [1] against William C. Collins and Warner Bros. Records, Inc. ("Warner"), a subsidiary of Warner Communications, Inc.

Stuart, who resides in Birmingham, Alabama, participated in 1966 in the formation of a band which took the name "The Rubberband." After this group disbanded, plaintiff started a new band. He registered the mark "The Rubberband" with the U.S. Patent and Trademark Office in 1971. (United States Service Mark Registration No. 908,846). The registration covers the provision of musical performances. The plaintiff testified (and the court finds) that his band, using the Rubberband name, had been under his direction and control from the date of its inception. The Rubberband recorded a number of albums, mostly on minor labels. According to the plaintiff, these recordings served primarily as vehicles for introducing the band's music to promoters of live concerts. Stuart testified that he sent the albums to radio stations and concert promoters, and that he performed live concerts at various locations in the South, including colleges and army bases. Albums also were occasionally consigned to record stores. Stuart testified that he did not know if any albums sold, but they did receive some air play. Stuart also testified that his activities under the Rubberband mark have not generated any appreciable income in excess of his expenses.

Defendant Collins is a musician known as Bootsy or Bootsy Collins. Prior to 1976, he played bass guitar with a number of popular bands, including James Brown and Parliament. In 1975–76, he decided, in consultation with George Clinton, producer of Parliament, that it was time for him to start his own band. Collins made a number of tapes which came to the attention of Robert Krasnow, a Warner executive responsible for hiring new talent, who signed him for Warner. After considering other names, Collins, accepting Clinton's suggestion, called his group Bootsy's Rubber Band and his first album "Stretchin Out in Bootsy's Rubber Band". Warner Bros. began a

---

1. 15 U.S.C. § 1114. The plaintiff also requested that the court charge the jury on a second cause of action—a state law claim for dilution of the plaintiff's mark. This request was de-
nied on the ground that it violated the terms of the pre-trial order to which the parties had agreed.

promotional campaign for "Bootsy's Rubber Band" with the release of this album in March 1976.

In June 1976 plaintiff came across the defendants' album in a Woolco store in Alabama. Within a few days plaintiff's attorney wrote to Warner demanding that the defendants cease using the "Rubber Band" name as it infringed on the plaintiff's registered mark.[2] Although a series of letters were exchanged between the plaintiff or his lawyer and Warner discussing the possibility of settlement, the parties were never close. The first "Bootsy's Rubber Band" album became increasingly successful through the summer of 1976, and as Krasnow testified, Warner Bros. responded with more promotion.[3] In the Spring of 1977, a second "Bootsy's Rubber Band" album was released. Plaintiff then brought this action. Two more albums have followed.

The plaintiff claims that the defendants' use of "Rubber Band" in connection with Collins' concerts and recordings creates a likelihood of confusion regarding the source of the musical services offered by the parties.[4] The plaintiff further claims that defendants' successful use and extensive promotion of the Bootsy's Rubber Band name has resulted in the appropriation of the plaintiff's mark, so that as a practical matter plaintiff can no longer hope to use his mark successfully in commerce.[5] The defendants denied these contentions, and further claimed that the plaintiff had, through various acts and omissions, lost the right to enforce his mark. This latter claim took the form of five affirmative defenses. The defendants argued that the plaintiff made a knowing, material misrepresentation to the patent office in a "continuing-use" affidavit filed in 1977,[6] abandoned his mark by failing to use it and intending to not resume use,[7] and misused his mark by permitting indiscriminate substitution of musicians and failing to exercise supervision of quality control.[8] The defendants also contended that laches and estoppel barred prosecution of the plaintiff's claim. The laches defense was withdrawn before the close of trial.

The plaintiff sought to recover his losses, an accounting of defendants' profits, and injunctive relief, pursuant to 15 U.S.C. §§ 1116, 1117.

The plaintiff demanded a jury trial on the issues involved in the legal claim for money damages, and waived any right he might have to a jury trial of the affirmative defenses. The case was tried before a jury on February 11, 13, 14, 19, 20, 21 and 22, 1980. The jury was charged and asked

---

2. Plaintiff's Exhibit 16 was a letter dated June 17, 1976 from Mr. Stan Downey, a Birmingham attorney Warner Bros. The letter stated in pertinent part:

   This office represents Thomas G. Stuart, II, of Tuscaloosa Alabama. Mr. Stuart is a musician and has several recordings out. His group is known as The Rubberband. He is the owner of the registered trade-mark The Rubberband, which was duly registered and published in December 1970. (Refer to U.S. Department of Commerce TRADEMARKS NOTICES Vol. 881, number 2, December 8, 1970 at p. 123, copy enclosed).

   We believe that the album [Stretchin Out in Bootsy's Rubberband] by its use of the name Rubberband, constitutes an infringement upon the Trade-Mark "The Rubberband," owned by Mr. Stuart. We are therefore notifying you of that position, and requesting that Warner Brothers Records, Inc. immediately cease use of the name Rubberband on any records, covers or packaging.

3. The parties stipulated and agreed that Warner Bros. spent in excess of $120,000 promoting the first album, and over $620,000 on promotion of Bootsy's Rubber Band overall. Krasnow testified that Warner Bros. increased its promotional efforts as the sales on the first album increased, and that the album did not become a major success until the summer of 1976. *See* Plaintiff's Exhibit 39.

4. 15 U.S.C. § 1114 (1978).

5. *Cf. Big O Tire Dealers Inc. v. Goodyear Tire & Rubber Co.*, 408 F.Supp. 1219 (D.Colo.1976), *modified & affirmed*, 561 F.2d 1365 (10th Cir. 1977), *cert. denied*, 434 U.S. 1052, 98 S.Ct. 905, 54 L.Ed.2d 805 (1978).

6. Court's Exhibit D. *See* 15 U.S.C. § 1115(b)(1) (1978).

7. 15 U.S.C. §§ 1115(b)(2), 1127 (1978).

8. 15 U.S.C. § 1127(b) (1978). *Cf. Independent Baking Powder Co. v. Boorman*, 175 F. 448 (C.C.N.J.1910).

to respond to special interrogatories pertaining to the claim of infringement as well as the affirmative defenses [9] and the various claims for damages.[10]

Both sides agreed that the question of infringement belonged to the jury to decide, and that the jury would function in an advisory capacity as to the affirmative defenses. With respect to the monetary award, the defendants did not challenge the jury's authority to value the loss suffered as a result of the infringement, but contended that the accounting of the defendants' profits is a function to be performed by the court, and further that the court, and not the jury, should exercise the functions of increasing or decreasing awards of loss and profits in the interest of justice under § 1117.

■ The jury found for the plaintiff on the issue of likelihood of confusion and delivered a verdict for the plaintiff on infringement. Because this question was within the jury's province, see *Dairy Queen, Inc. v. Wood*, 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962), (and in addition because I agree with the jury's verdict on this question) I accept this verdict.[11]

The testimony of plaintiff's expert Bruce Morrow, for many years a leading disc jockey under the name Cousin Brucie, was convincing on several disputed issues. As to defendants' claim that the word Bootsy is the core of the defendant's name and that the name would not be used without it,

Morrow convincingly disagreed. It is notable that defendants' own record jackets contain references to "the Rubber Band" and newspaper articles introduced by the defendants also refer to "the Rubber Band" as though that were its name. *See* Defendant's Exhibit Q.

■ The jury's verdict on the affirmative defenses was advisory, *see* F.R.Civ.P. 39; *cf. The Five Platters v. Purdie*, 419 F.Supp. 372 (D.Md.1976). The jury found for the plaintiff on the four defenses (laches was withdrawn). I concur with the jury's verdict. My findings were set forth on the record after the jury was discharged. I find that the defendants failed to establish any facts which might make out the affirmative defenses.[12]

On damages the jury answered the special interrogatories and awarded verdicts as follows. First, as to Collins:

The jury found plaintiff's injury or loss to be $50,000. It declined to increase this award in the interest of justice as against Collins, and instead reduced it to $0.

The jury found that Collins' infringement was not done in wilful disregard of plaintiff's rights.

As to Collins' profits, it was stipulated that his total profits were $225,000. Of these the jury found that $0 was attributable to the infringement, that $0 should be the basis of an award, that the award

---

9. Court's Exhibit F.

10. Court's Exhibit H.

11. Warner's new counsel who entered the case after trial argues in a post trial brief the charge was erroneous in its instruction that the jury was to determine the likelihood of confusion on the assumption "that the plaintiff continues to perform under the Rubberband mark and does so successfully, so that his performances are widespread, his recordings are sold in record stores and are played on the radio." (Tr. 1124–25) The theory of this charge was that a lawful and registered owner of a mark should not be done out of legal protection by the fact that his best efforts had not yet succeeded in winning fame for his mark.

Warner's new counsel are doubtless unaware that this precise point was discussed at length among court and counsel in a pre-trial charge conference at which all agreed to the correctness of this instruction. Furthermore, the charge was distributed to counsel in draft form three days in advance to give counsel full opportunity for prior comment and suggestions. A lengthy session was held for the receipt of counsel's suggestions. Trial counsel for Warner's made no objection to the language in question, but requested additional language to the effect that the absence of proof of actual confusion is strong evidence of no likelihood of confusion. I rejected this request as inappropriate to the facts of this case, given plaintiff's lack of renown. *See* Tr. 918–21, 969–70. No exception on this ground was taken after the charge. *See* Tr. 1134–38.

12. Tr. 1218–1221.

should remain at $0 after considering the right to increase or decrease; and that the total award against Collins incorporating both the plaintiff's loss and the defendant's profit should be $0.

As to Warner, the findings were as follows:

Plaintiff's loss or injury, as stated above was found to be $50,000. The jury elected to increase up to the full permitted trebling, and found $150,000 as awardable.

Warner's infringement was found to have been "done in knowing, wilful disregard of plaintiff's rights".

The profits of Warner were stipulated to be $992,587. Of this, the jury found $350,000 awardable before considering the question of increasing or decreasing. Finally, considering the power to increase or decrease in the interest of justice, the jury adhered to the $350,000 figure. Combining this with the $150,000 found above on account of the plaintiff's trebled loss, the jury made a total award of $500,000.[13]

Counsel were offered the opportunity to have the jury instructed further with a view to rationalizing possible or apparent discrepancies and inconsistencies. All parties declined further instruction and accepted the jury's verdict in the form rendered (without waiver of Warner's contention that certain issues were properly the province of the court and not that of the jury).[14]

■ I accept and adopt the jury's finding of $50,000 as the measure of plaintiff's loss. Plaintiff's expert testified persuasively that "the Rubberband" was a "terrific" name for a rock group.[15] The proof showed convincingly that the defendants have appropriated plaintiff's name, that he cannot hope to achieve success or be marketed by any record company using a name so likely to be associated with the successful defendant Collins.[16] I find plaintiff will be required to find, adopt and register a new name and will lose whatever goodwill he may have built up in the Rubberband name.

The next question now submitted concerns the division of responsibility between court and jury as to other aspects of the damages award. The dispute does not involve the jury's findings of $0 damages against Collins, which is accepted as conclusive by all parties. It focuses on two particular issues. Warner first contends that the accounting of its profits is a traditional equitable remedy for the court. Second, Warner contends that the statutory authorization to treble loss damages and to increase or decrease awardable profits goes only to the court and not the jury.

Before considering the merits of these questions, I will set forth what my findings are on the affected issues, so as to ascertain whether, and to what extent, it makes any practical difference whether the findings are made by court or jury.

Dealing first with the award based on Warner's profits, treating the jury's award as advisory, I concur in the finding that the awardable profits are in the amount of $350,000.

■ In my view, the profits attributable to the infringing name were not large. In addition, however, plaintiff was entitled to receive all the profits earned by *wilful* infringement, even though the profit was not attributable to the infringement. Where infringement is done knowingly and with callous disregard of the rights of a mark holder, all the profits of such activity are awardable although the use of the infringing name may not have contributed causally to the sales or profits. *See W. E. Bassett Co. v. Revlon, Inc.*, 435 F.2d 656, 664 (2d Cir. 1970).

The jury found that Warner infringed in knowing, wilful disregard of plaintiff's rights. I concur. There was no question Warner was fully aware of plaintiff's rights from an early date following his lawyer's letter in June of 1976. The evidence of the settlement negotiations rather suggested

---

13. Court's Exhibit F, H.

14. Tr. 1215.

15. *See* Tr. 289.

16. *See, e. g.*, Tr. 286, 288, 171, 568.

that Warner had strung the plaintiff along, giving no real recognition to his legal rights, but confident that he would not sue. The testimony of the Warner executive Krasnow, furthermore, bluntly proclaimed a callous policy on such matters. On the question of concern for the possibility of service mark violations, he explained, "We at Warner Bros. are not policemen; we are in the music business." [17] His further testimony appeared to say that promotional decisions at Warner paid little heed to possible adverse trademark rights, but were based only on commercial factors.[18] His testimony to the effect that Warner intended at present time to market the recordings of a new musical group under the name "Billy Karloff and the Supremes," in spite of the fact that a famous group had used the name "The Supremes," may have impressed the jury as either false or callous.[19] Finally, Krasnow, in his determination to convey that it is not the name but what is "in the grooves" that sells a record, expressed the opinion that a recording by a well known group would sell neither better nor worse under the group's famous name than if the group concealed its identity under an unknown name.[20] The jury may well have found in this testimony (as did the court) a callous disregard for the oath, suggesting the possibility of an equally callous disregard for adverse rights.

Although awareness of an adverse claim would not necessarily make infringement wilful, especially where the defendant believed in good faith that its name did not infringe, the evidence in this case rather showed that Warner gave short shrift to plaintiff's claim out of arrogance and confidence that he would not mount any significant legal attack. By reason of Warner's wilful violation from an early date, I would find, like the jury, that $350,000 of Warner's profits from Bootsy recordings (which amounted in total to $992,587) were earned during wilful infringement and were therefore awardable.

Since my finding of awardable profits, taking the jury's findings as advisory, would equal the jury's, no practical difference attaches to whether this issue is properly decided by the court or by the jury.

Next, I consider the power conferred by § 1117 to treble an award based on plaintiff's losses and to increase or decrease awards of profits.

As noted above, the jury exercised this power by trebling against Warner the finding of $50,000 loss or injury to plaintiff, but made no adjustment to the $350,000 found as awardable profits.

In this respect I differ with the jury. The jury apparently believed that fairness required that the loss award be increased by $100,000. I do not agree. If the power conferred by § 1117 to increase the award belongs to the court, I, taking the jury's action as advisory, would reject it in this regard. Furthermore, as discussed below, I would differ with the jury on the exercise of the right to increase or decrease the award based on the profits of the defendants.

It is therefore necessary to rule whether this power to adjust is conferred by § 1117 only upon the court, or whether in a case in which damages are being found by the jury, this power also belongs to the jury.

On its face, the statutory designation of "the court" seems to refer to the judge.[21]

17. Tr. 447.

18. *Id.*

19. Tr. 445.

20. Tr. 452.

21. The statute states in pertinent part: When a violation of any right of the registrant of a mark registered in the Patent Office shall have been established in any civil action . . . the plaintiff shall be entitled, subject to the provisions of Sections 1111 and 1114 of this title, and subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action. The court shall assess such profits and damages or cause the same to be assessed under its direction . . . . In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such

Defendant points out furthermore that whereas, in speaking of finding basic "profits and damages", the statute provides that "the court shall assess [them] . . . or cause [them] to be assessed under its direction," it contains no such alternative provisions ("or cause to be assessed") in speaking of the power to treble the losses or to increase or decrease the award of profits. The argument suggests that the "or cause the same to be assessed" empowers a jury as to the basic finding, but its omission excludes the jury from the power to amend.

The statutory history further confirms this view. It appears that § 1117 largely restated, in the context of the merger of law and equity, the pre-existing statutory law contained in §§ 16, 17 and 19 of the Act of February 20, 1905, Pub.L. No. 84, 58th Cong., 3d Sess.

Section 17 of the 1905 Act provided that the federal courts should have original jurisdiction over suits brought under the 1905 Act "at law or in equity". This distinction between the two forms of action was maintained in sections 16 and 19, which listed the remedies available in the two jurisdictions.

For actions at law, § 16 provided that "the *court* may *enter judgment* . . . for any sum above the amount found by the *verdict* as the actual damages . . . [not exceeding three times the amount]." (emphasis supplied) And Section 19, governing actions in equity, gave "the court . . . the same power to increase such damages, in its discretion, as is given by section sixteen . . . for increasing damages found by verdict in actions of law. . . ."

It is quite clear under the formulations of the 1905 Act that the power to increase the actual damage belonged to the judge, and not the jury, regardless whether judge or jury was acting as fact finder.

Neither the language of the new § 1117, nor any of its legislative comment, display

any intention to depart from this aspect of its 1905 source. *See Report of Senate Committee Patents*, [1946] *U.S.Code Cong. & Admin.News*, p. 1275. I consider myself bound to construe § 1117 consistently with its predecessor in this respect.

The 1905 Act did not provide for any adjustment of a profits award. The Lanham Act provides such power, and allocates it to "[t]he court." This power is to be exercised by the court when it "enter[s] judgment." The quoted language strongly suggests that Congress intended, for the adjustment of profits as well as for the increase of loss awards, a function performed by the judge, and not the jury.

Further reason for giving this power to the judge rather than the jury can be found in the function this power serves in the statutory scheme. This scheme for award of compensation recognizes that in this area any pre-specified formula is likely to be grossly inappropriate to a specific set of facts. A plaintiff whose rights have been reprehensibly trampled may be unable to prove significant damages. The statute provides also for an award based on the defendant's profits. But obvious problems remain. On the one hand, the defendant, despite egregious and wilful infringement, may have earned no profit. And an injunction may be useless to the plaintiff where, as here, the defendant's unlawful use of plaintiff's mark effectively forecloses plaintiff from using the mark in the future.

On the other hand, the capacity for an award of profits to overcompensate is apparent. The defendants' profits may be on a scale grotesquely out of proportion to plaintiff's circumstances; the award of profits may represent excessive punishment to the defendant and unjustifiable enrichment and windfall to plaintiff.

There are instances in which an award of profits is unnecessary and unreasonable over and above an adequate award based on plaintiff's loss. In other instances a remedy

---

amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judgment for such sum as the court

shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty.

based on plaintiff's loss is inadequate (even when trebled) unless supplemented by defendant's profits. And in still more instances, neither formulation is really appropriate without an upward or downward modification.

The statutory scheme seems to recognize the impossibility of formulating standards which will reliably produce a reasonably just result and the danger that verdicts based on pre-specified formulations will do serious injustice in one direction or another.

■ It appears that Congress has therefore granted an unusual power and responsibility to the judge to adjust findings so as to make them consistent with the purposes of trademark law. I would construe the statute as imposing on the court a special duty, in view of the vagaries and dangers mentioned above, to consider the question whether "the amount of the recovery based on profits is either inadequate or excessive," 15 U.S.C. § 1117, and insuring that the court's power to alter the award shall be broad and unfettered by providing that "the court may *in its discretion* enter judgment for such sum *as the court shall find to be just.*" (emphasis supplied) Thus, in this problematic area, Congress for good reasons has dictated that the jury's findings shall not have the same presumptive correctness and finality as is normally the case.[22]

Considering the application of these principles to the facts of the case, I conclude that an award which aggregates the $50,000 injury and $350,000 of profits realized by wilful breach amounts to an unjust enrichment and an excessive punishment.

Although I stated above that the jury's finding of wilfulness on Warner's part was amply supported by the evidence and that I concur with it, this was far from being the most reprehensible kind of wilful infringement. It was not a case in which the defendant chose its name in an attempt to

trade on plaintiff's goodwill or in a bad faith effort to harm the plaintiff. Indeed there was no suggestion that either defendant was even aware of plaintiff at the times the name was selected and first promoted. Warner did not become aware of plaintiff's claim until it had already launched the first Bootsy's Rubber Band album and had expended considerable sums in publicizing the name. While Warner could have dealt with the plaintiff in a manner more sensitive to his legitimate rights, it could not have ceased using the Rubber Band name on receipt of plaintiff's notice without incurring large expenses, sacrificing extensive promotion already undertaken, and risking to scuttle the successful launching of a new artist. Without undermining, or suggesting disagreement with the jury's finding that Warner proceeded callously thereafter, this was nonetheless a far cry from the most pernicious infringements the statute was designed for. In view of these considerations, an award of $350,000 profits seems excessively punitive to Warner (not to mention its possible impact on Collins if Warner succeeds in imposing on him the contractual indemnity which it claims).

From plaintiff's point of view also, the award seems excessive. Plaintiff acknowledges he has never had earnings significantly in excess of his expenses. The happenstance of defendants' infringement and the jury's award would suddenly raise his earnings by his musical endeavors to half a million dollars, substantially more than Bootsy Collins' considerable success has yet netted him (even after allowing for plaintiff's counsel's share).

I conclude that a just award, over and above the plaintiff's $50,000 for his losses, would reduce the award based on Warner's profits from $350,000 to $200,000. Adding together the two components, judgment shall be entered in the amount of $250,000.[23]

22. Warner cites portions of the legislative history of the Lanham Act to support its contention that the framers of § 1117 specifically intended to reserve for the judge the power to modify damage and profit awards. *See, e. g.,* 1939 Hearings on H.R. 4744 (March 28–30, 1939) at 154; 1938 Hearings on H.R. 9041 (March 15–18, 1938) at 43; 1941 Hearings on H.R. 102, H.R. 5461 & S. 845 (November 4, 12–14, 1941) at 204–06.

23. Counsel for the defendants sought to intro-

## B. *Injunctive Relief*

Pursuant to 15 U.S.C. § 1116, plaintiff seeks an injunction against the defendants' continued use of Rubber Band.

■ I find, however, that the plaintiff is adequately compensated by the damages awarded, both for the harm suffered in the past and for any harm plaintiff might suffer in the future by virtue of the defendants' continued use of the name "Bootsy's Rubber Band." The award compensates the plaintiff far in excess of his loss and injury occasioned by the infringement. He has also received a significant portion of the defendants' profits.

Plaintiff's proof established that the "Rubberband" mark had been appropriated by the defendants, and that the plaintiff could therefore not hope to use the mark successfully in commerce. I find that plaintiff is effectively prevented by the success of Bootsy's Rubber Band from using the Rubberband name successfully in commercial recordings even if defendants ceased to use the name. To grant an injunction would therefore harm the defendants without granting any benefit to plaintiff. I therefore decline to grant injunctive relief.

SO ORDERED.

duce evidence of Warner Bros. income taxes, contending that the last line on the parties stipulation of profits and expenses refers to a "pre-tax" figure, and, that income taxes were a deductible expense within the contemplation of 15 U.S.C. § 1117.

For the reasons stated on the record, *see* Tr. 717–27, 731–33 (primarily that plaintiff was misled by defendants' stipulation and would be prejudiced by the unanticipated receipt of such evidence), I declined to permit the defendant to introduce this evidence before the jury. In arguing that there was no surprise or prejudice, defense counsel pointed out that he had listed Warner's accounting officer Holmes as a witness in the pre-trial order I note that at an unrecorded pre-trial conference in my chambers on the eve of trial, when a question was raised why the defendant would call an accounting witness in spite of the stipulation covering financial items, no suggestion was made by defense counsel that the witness would testify as to the defendant's taxes.

Notwithstanding my decision to bar introduction of the defendant's taxes before the jury, I invited the defendants to submit any materials they deemed appropriate after trial regarding the deductibility of the income taxes paid by Warner Bros., so that I could consider the propriety of adjusting the jury award on the basis of this evidence.

I decline to make any adjustment based on the defendant's taxes for three reasons. First are the reasons which were set forth in the transcript at trial when the issue arose—in particular the unfairness to plaintiff who forebore conducting discovery of Warner's finances, but accepted these as represented to him, as part of a trade-off which permitted him to rely on stipulated figures which assured him of an adequate basis for compensation. Secondly, there is some exaggeration in Warner's argument that it is unfair to fail to give it full allowance for taxes paid. For the payment of the award will represent a tax deduction which should result in recovery of a significant portion of the tax initially paid. Third in view of the discretionary reduction of the award of profits in the interest of justice from $350,000 to $200,000, no additional allowance based on taxes is appropriate.