**ALPO PETFOODS, INC., Plaintiff,**

v.

**RALSTON PURINA COMPANY,
Defendant.**

Civ. A. No. 86–2728.

United States District Court,
District of Columbia.

Nov. 25, 1991.

Richard J. Leighton, Richard F. Mann, Douglas J. Behr Mann, Dan M. Peterson, Anita M. Nanni, Leighton and Regnery, Washington, D.C., for plaintiff.

Michael L. Denger, Steuart H. Thomsen, Emily J. Krudys, Sutherland, Asbill & Brennan, Washington, D.C., for defendant.

## MEMORANDUM OPINION AND ORDER

SPORKIN, District Judge.

The above-captioned action comes before this Court on a mandate from the Court of Appeals for the District of Columbia Circuit to recompute damages and attorney's fees. *See ALPO Petfoods Inc. v. Ralston Purina Co.,* 913 F.2d 958 (D.C.Cir.1990), *aff'g in part and rev'g in part ALPO Petfoods, Inc., v. Ralston Purina Co.,* 720 F.Supp. 194 (D.D.C.1989). This Court held a 61–day trial in 1986 on claims and counter-claims brought under the Lanham Act, 15 U.S.C. § 1125(a), for false and/or deceptive advertising by ALPO Petfoods Inc. ("ALPO") and Ralston Purina Co. ("Ralston"), two of the major dog food producers in the United States. Each party was enjoined by this Court from making further unlawful claims, was required to issue corrective statements, and was awarded attorneys' fees and costs. In addition, ALPO was awarded $10.4 million in damages, but this Court found that Ralston was not entitled to damages.

On September 7, 1990, the Court of Appeals affirmed this Court's findings of fact regarding the respective liability of the parties. *See ALPO Petfoods, Inc. v. Ralston Purina Co.,* 913 F.2d 958 (D.C.Cir.1990). However, it vacated the damage award and remanded the case to this Court. Because it was unclear whether either party had sufficiently proved damages as required under the Court of Appeals' interpretation of the Lanham Act, further hearings were held on the issue of damages.

On June 17 and 18, 1991, this Court held hearings at which time each side presented expert testimony on the damage issues. By agreement of the parties, testimony was limited to facts developed in the original record. Oral argument was held on August 8, 1991.

*Background:*

This case was originally brought by ALPO against Ralston on the grounds of false and deceptive advertising. Ralston manufactures and sells Puppy Chow, the leading puppy food in the United States. During 1985 and 1986, Ralston ran a television and print advertising campaign stating that Puppy Chow could ameliorate and help prevent degenerative joint disease and canine hip dysplasia (the "CHD" campaign). These claims were not supported by sound scientific authority. Furthermore, the research done by Ralston on the CHD claims was designed and carried out in a faulty manner, with unfavorable information and tests suppressed. The result was a false and misleading ad campaign which perpetrated a cruel hoax on dog owners.

The CHD campaign proved to be monetarily rewarding to Ralston. Evidence produced at trial demonstrated that the ads materially increased Ralston's sales and profits. Indeed, Ralston's sales increased during the period of the CHD campaign, and in a highly competitive dog food market, this increase necessarily came at the expense of its competitors, the leading one of which was ALPO.

In its original opinion, this Court found that Ralston was guilty of false and deceptive advertising, and that ALPO had been damaged by Ralston's conduct. Recognizing, as the Court of Appeals noted, that determining the exact amount of damages from false advertising is a difficult task, *ALPO,* 913 F.2d at 969, the Court, after a review of the entire case, decided to apply

the damage formula set forth in *U Haul Int'l v. Jartran Inc.*, 793 F.2d 1034 (9th Cir.1986). In that case, the court determined that the financial benefit to the wrongdoer was at least equal to its advertising expenditures. Similarly, this Court decided that the amount spent by Ralston on the CHD campaign was a reliable calculation of what that campaign was worth and the benefit obtained by Ralston. It appeared to this Court that, at the least, all benefits obtained by a violator of the Lanham Act should be required to be disgorged and awarded to the party that took the initiative to bring a halt to the impermissible and improper practices. It seems that in a free and competitive market this is a highly desirable form of encouraging the marketplace to police itself.

Ralston had spent many millions on its CHD campaign, and accordingly, ALPO was given a judgment of $10.4 million. This Court concluded that such an award would serve to reward an entity that had been severely affected by the unlawful acts of a competitor and had been willing to step forward to stop those acts. ALPO's lawsuit was clearly motivated by its desire to protect its own share of the market and its future business prospects. ALPO's commendable action, however, has also had the effect of ridding the marketplace of a highly deleterious anticompetitive, false and misleading advertising campaign, all to the benefit of the consuming public.

Ralston counter-claimed under the Lanham Act against ALPO. This claim involved an ALPO ad campaign, run approximately during the same period as the CHD campaign, which claimed that the "formula" for the newly-introduced ALPO puppy food was preferred by veterinarians 2-to-1 over that of other puppy foods. This ad was run on television and in consumer print and was made on bags and cans of ALPO's puppy food. While originally ALPO advertised that the "formula" was preferred over every leading brand, after September 1985, ALPO stated that its "formula" was preferred over "the leading brand" which

was clearly intended to be and was understood to be Purina Puppy Chow.

The surveys used to substantiate the ALPO claims were flawed. In addition, for at least some time period, the preference ratio resulting even from these surveys did not reflect the 2-to-1 claims made by ALPO. This Court found that the preference ads were false and in violation of the Lanham Act.

However, this Court found that Ralston counterclaimed against ALPO only as an afterthought, to counteract the more serious charges leveled against it by ALPO. In contrast to Ralston's false advertising campaign, intentionally aimed at those who could be misled because of genuine concern for their animals' health, ALPO's misleading actions were of a much lesser degree. Accordingly, while the Court found that ALPO's actions were material enough to be enjoined, the contrast in the wrongdoing between the parties obviated the need to award Ralston any damages.

On appeal, the $10.4 million damage award to ALPO was vacated. The Court of Appeals limited ALPO to only those damages it actually suffered due to Ralston's unlawful behavior. No award could be premised on the benefits obtained by Ralston as a result of its wrongful conduct. As a matter of symmetry the Court of Appeals found Ralston was entitled to damages it could prove it had sustained as a result of ALPO's offending ads, ruling that the degree of injury or wrongdoing was irrelevant under the Lanham Act. While reversing this Court's award of damages and instructing this Court to limit its award to actual damages sustained by each party due to the acts of the other, the Court of Appeals went on to note that damages were difficult to ascertain in this type of litigation, and that "litigants, who best understand their real losses, almost always settle these cases once a court has given its views of the merits." *ALPO*, 913 F.2d 969 n. 12.[1]

This Court originally awarded each party the attorneys' fees associated with its suc-

---

1. Although this Court brought this part of the Court of Appeals decision to counsel's attention,

no progress in the settlement of this dispute has been made.

cessful false-advertising claim. The Court of Appeals ruled that under the Lanham Act, attorneys' fees are appropriate only in exceptional cases, such as those involving willfulness or bad faith. *ALPO*, 913 F.2d at 971. Notwithstanding this Court's references to Ralston's suppressing the results of certain of its research findings, the Court of Appeals did not find that there was or could be a basis for requiring Ralston to pay ALPO's attorneys' fees. Because ALPO did not cross appeal this Court's initial decision, the Court of Appeals did not disturb this Court's order that ALPO pay Ralston's attorneys' fees with reference to Ralston's counter claim. ALPO has moved this Court for a reduction in the amount of attorneys' fees claimed by Ralston, on the grounds that the amount asserted by Ralston is undocumented and inequitable.

*Discussion:*

This Court will turn first to the issue of damages. At the remand hearing, each party presented one summary expert witness. Dr. James Miller, III testified on behalf of ALPO and Dr. Thomas R. Overstreet testified on behalf of Ralston. The testimony, by agreement of the parties, was limited to the witness' assessments of the damage claims based upon the record from the original trial.

Dr. James C. Miller, III is a practicing economist with research and teaching experience. He has served in many high-level government posts. His positions include: Director of the Office of Management and Budget and Chairman of the Federal Trade Commission. Ralston's expert, Dr. William Overstreet, is a practicing economist who has authored many works and served on the staff of the Federal Trade Commission.

ALPO claims it is entitled to $13,022,437 in damages, which comes to $15,529,256 after Consumer Price Index adjustments: $352,000 of this is claimed for allegedly lost profits; $5,218,000 is claimed for the costs of responsive advertising and promotions; $2,944,476 is claimed for the higher cost of entry-advertising in the national market; and $4,507,961 is claimed for the delay in its net income stream.

Ralston claims it is entitled to between $2,335,012 and $3,051,376 in actual damages as a result of ALPO's false claims. This amount principally includes lost profits as well as $53,434.86 representing the costs of completed responsive advertising. An adjustment by the Consumer Price Index would bring the total up to $2,775,585—$3,623,421.

In addition, both parties claim certain non-quantifiable losses. The Court of Appeals cautioned this Court to avoid a damage award that was a "penalty" rather than compensation for damages caused by the other party's wrongdoing. Section 35(a) of the Lanham Act does specifically authorize a court to "enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount." 15 U.S.C. § 1117(a). The parties, in an effort to justify an enhanced award under this provision, have therefore included extensive proof of non-quantifiable damages.

The issues surrounding proof of the various damage claims vary by category, and thus they will be considered separately.

*Lost Profits:*

The lost profits claimed by both parties must meet two tests in order to satisfy the Court of Appeals' standard of particularity. First, the parties must be able to prove that there is a causal connection between the wrongful conduct and the lost profits. Second, they must show either that the sales lost were actually diverted to the wrongdoer or that sales were made at reduced prices because of the actions of the wrongdoer. *ALPO*, 913 F.2d at 969.

Both Ralston and ALPO based their quantifications of lost profits on regression analyses done by ALPO's economist for the first trial, Dr. Bruce Owen. A regression analysis is a statistical method used to explain variations in a dependent variable on the basis of independent variables which are deemed to be causing such variations. Dr. Owen's regressions were designed to explain variations in ALPO's and Ralston's dollar shares of the puppy food markets,

using mathematical equations. The analysis also takes into account the probability that each independent variable is in fact related to the dependent variable.

At the first trial, this Court credited those analyses to the extent that they proved that there was a material effect based on the false CHD campaign, and the Court of Appeals did not question their reliability. This Court never fully credited the regression studies in reaching a determination on the quantification of damages. Dr. Owen's work was found only to "indicate that there is sufficient evidence to show Ralston's CHD campaign was above average in effectiveness." *ALPO*, 720 F.Supp. at 209. Although this Court did find that Ralston's success was "achieved at the expense of its competitors, including ALPO," it did not attempt to quantify ALPO's lost profits using the regression analyses. *Id.* These analyses were strongly contested by Ralston's attorneys and experts at the trial.

Both Ralston and ALPO relied heavily, if not exclusively, on these studies in quantifying their damage claims at the remand hearing. ALPO frequently questioned Ralston's use of these regression studies to prove damages, based on Ralston's earlier position. Ralston's position, although it continued to object to the reliability of the regression analyses, was that if the studies were to be used for assessing ALPO's damages, they also could and should be used in assessing Ralston's damages.

While that position is arguably legitimate, the continuing debate on the unreliability of Dr. Owen's regression analyses makes that point irrelevant. At the remand hearing, there was controversy over the correct numbers to be used in the regression analyses. Ralston claims that ALPO had mixed national and local variables and had included sums of money that should have been excluded. Resolution of this debate alone would require this Court to engage in a prolonged mathematical exercise on issues upon which even economic experts are unable to agree.

Despite having based his entire lost profits quantification on the regression analyses observed above, Ralston's expert, Dr. Overstreet, expressed his considered opinion that the regression analyses were unreliable. He testified at the remand hearing that he could not accept the validity of the regressions, because they suffered from a number of infirmities. Tr. of Remand Hearing, at 275. In fact, Dr. Overstreet testified that, in his opinion, Dr. Miller, ALPO's expert, would have to agree that the regressions were inappropriately configured. He stated that the only reason that the analyses had not been discarded was this Court's earlier acceptance of those analyses for materiality purposes. *Id.* at 282.

No other means of calculating the lost profits were presented at trial. Dr. Overstreet conceded that the evidence before the Court was not sufficient to permit the Court to make a lost profit determination.

The Court of Appeals specifically cautioned this Court against awarding "speculative" damages. *ALPO*, 913 F.2d at 969. The evidence in support of the lost profits figures sought by each party is nothing if not speculative. The parties did supply evidence other than the regression analyses in order to prove that there was additional non-quantifiable harm. The reliability of that evidence is rendered irrelevant, in the context of lost profits, however, by the parties' inability to prove lost sales with sufficient accuracy and authoritativeness.

This Court is simply not satisfied that it can rely on the equations and figures produced by Dr. Owen's analyses for a specific numerical calculation when their integrity for the purpose of reaching a damage figure was questioned by an economist of such renown as Dr. Overstreet. These analyses, while useful for demonstrating general trends and the broad impact of certain actions, are simply not usable with respect to the type of specific, concrete evidence needed. Without the regression analyses, however, there is nothing in the record from which this Court can deduce a lost profits figure without speculation.

█ It was because of this inability to accurately determine lost profits that this

Court, in its original opinion, determined that the best way to assess damages is to look to the benefits derived from the offending practices. Based on the evidence, this was a rather easily quantifiable amount. The Court of Appeals, however, has precluded such damages. Under the restraints of the Court of Appeals' decision, this Court has no choice but to deny the award of lost profits to both ALPO and Ralston. There is no award to either side, therefore, on this element of damages.

*Responsive Advertising:*

ALPO has conceded the $53,434.86 claimed by Ralston for ads or promotions responsive to ALPO's false ad campaign. The responsive advertising conceded by ALPO consists of a market survey performed by Ralston to determine the truthfulness of ALPO's preference claims and a follow-up letter to veterinarians addressing Ralston's own survey evidence and designed to correct any misconception created by the ALPO ad campaign.

This Court finds that these steps unquestionably constitute advertising or promotional activity which is directly responsive to the misleading claims circulated by ALPO. The letter and the surveys clearly were aimed at examining and defeating ALPO's preference claim. Moreover, the conduct and the expenditures were entirely reasonable and appropriate, and it is plain that Ralston should be compensated for these costs, as is demonstrated by ALPO's concession on this issue.

ALPO's responsive advertising and promotion claim is somewhat more complicated. This Court has already found that ALPO engaged in counteradvertising. ALPO's entry into the marketplace was severely impeded by the false CHD claims, and it "spent a substantial amount of money in advertising expenditures in order to counter the CHD campaign, an amount over and above its planned advertising costs for ALPO Puppy Food." *ALPO,* 720 F.Supp. at 212.

Although this finding, made at trial, was not disturbed by the Court of Appeals, Ralston has disputed that ALPO's advertising and promotional costs were in fact "responsive." According to Ralston, damages for responsive advertising must be limited to conduct which specifically references the misleading advertising. ALPO's ads and promotional efforts did not mention Ralston's Puppy Chow, and therefore, according to Ralston, were not compensable "responsive" advertising.

This Court affirms its earlier finding on this matter. As Dr. Miller observed at the remand hearing, it may be strategically ill-advised for a company to mention its competitor in its ads. This "may get the consumer interested in the competitor's ad ... And secondly, [the company does] what appeals most to the consumer, and that may not be a negative ad addressed to [the] competitor's product." Tr. of Remand Hearing, at 36. In this case, it is difficult to imagine how ALPO could have responded in a positive manner to Ralston's claims, since it could certainly not claim that its puppy food prevented CHD more effectively than Puppy Chow. Furthermore, since Puppy Chow was the leading brand, it would have only served to increase consumer recognition of Ralston if ALPO had referenced Puppy Chow in its ads.

Even Ralston concedes that ALPO specifically targeted Puppy Chow in its advertising campaign. R. Post–Hearing Brief at 5. ALPO's ads were responsive to the threat presented by Ralston's CHD campaign, and it is irrelevant whether that response was explicit. ALPO clearly had no choice but to respond to the challenge presented by the CHD campaign and to expend funds which it might otherwise have used for non-advertising purposes. Accordingly, it deserves to be compensated for whatever its actual, reasonable expenses were.

ALPO claims $5,218,000 as the cost of all ads and promotions used by ALPO to blunt the impact of Ralston's CHD campaign. This amount was arrived at by calculating the difference between planned and actual advertising and promotional expenses in the fiscal years 1986 and 1987.

Ralston has objected to these costs, because there is no proof that the increased expenditures were due to the CHD campaign. The Court, however, finds that the increase was directly related to Ralston's campaign and is therefore compensable. This finding is supported by the trial testimony of Ms. Katharine Hillman, ALPO's vice-president of marketing, concerning Ralston's own recognition of its CHD campaign's huge success, and the coincidence in timing of ALPO's drastically increased spending and Ralston's CHD campaign. There is no support in the record for Ralston's belated contention that ALPO's expenses were fabricated or unreasonable, and as the Court of Appeals has stated, the wrongdoer must bear the risk of any such uncertainty that its wrongdoing had created. *ALPO,* 913 F.2d at 969.

Dr. Miller calculated that the promotional costs for 1986 were $3,028,000, the difference between the $7,672,000 of planned promotional expenditures and the $10,700,000 of actual promotional expenditures during the two fiscal years. The costs of responsive advertising, as calculated by Dr. Miller, were $2,190,000, the difference between the $9,524,000 in planned advertising expenses and the $11,714,000 in actual expenses.

ALPO is entitled to the sum of $3,585,610 for advertising and promotional expenditures. This sum includes the full $2,190,000 for advertising costs and $1,395,610 in promotional expenses. ALPO is entitled to be compensated only for those promotional expenses which are "reasonable." This Court finds that $1,632,390 of the money spent by ALPO on puppy food promotions relating to its misleading claims were not reasonable and have been excluded.

As part of its promotional activity, ALPO conducted an offer to give away a free bag of puppy food in return for a customer's redemption of a coupon. The offer, which cost ALPO $1,632,390, was unquestionably a part of ALPO's responsive promotional activity. It was an extraordinary offer, and a response to the market situation which Dr. Overstreet agreed was "drastic." Tr. of Remand Hearing, at 184–5.

However, this Court finds that compensation for this particular promotion would be inappropriate, because the coupons as well as the bag of puppy food offered in return displayed the false ALPO "2–to–1" preference claim. ALPO argues that it was the prospect of free puppy food rather than the preference claim which was the incentive for buyers to respond to the ALPO offer.

While this may be partially correct, the preference claim on the coupon was clearly intended to attract consumers and to convince them that redeeming the coupon was worthwhile, as the puppy food they would receive was recommended by veterinarians. Regardless of what actually operated in the mind of the average consumer, this Court finds that ALPO intentionally printed the false preference claim on a large number of its coupons as a means of inducing purchases of its product.[2] This Court simply does not find that such expenses were "reasonable" or allowable. ALPO, however, also conducted coupon offers which did not assert the preference claim. For these costs, it will be compensated.

*Delay in Market Entry:*

ALPO has claimed damages for the increased costs of entering the national market because of the CHD campaign. ALPO had planned to expand its market for ALPO Puppy Food from its regional east coast test market to a national market in July, 1986, but delayed doing this because of the intense competition presented by Ralston's false CHD campaign. ALPO claims that because of this delay it suffered increased advertising costs along with a delayed income stream.

The Court finds that this is a legitimate category of business loss and that the losses sustained were attributable to Ralston's

---

**2.** This Court is less concerned with the printing on the actual puppy food bag, as this would be read mostly by consumers who had already redeemed the coupon or purchased the puppy food. However, the coupon was definitely an advertising or promotional technique, as were the Ralston flyers.

false CHD campaign. The record at trial demonstrated that Ralston intended the CHD campaign to blunt any national competition from ALPO and that ALPO was indeed forced to delay its national plans because of its "difficulty in overcoming the extravagant and false claims made by Ralston." *ALPO,* 720 F.Supp. at 212. Ms. Hillman's testimony, which this Court credits, supports the finding that from April, 1986 the delay in the "rollout" of ALPO Puppy Food was due to Ralston's CHD campaign.

Ralston has argued that there can be no damage assessment based on the delayed "rollout" because the rollout never took place. This argument is not persuasive with respect to ALPO's claim for delayed income. The fact is that the harm caused by Ralston's false CHD claims was that it forced ALPO to reappraise its plans to go national. It is clear that ALPO has failed to receive the income which could have reasonably been expected from the planned nationwide marketing of its puppy food.

Ralston's argument is credited with respect to ALPO's increased advertising costs for the proposed entry into the national market. Because ALPO has not "rolled out" nationally and now has no real plans to do so, it has, in fact, been spared the cost of advertising for the proposed rollout. ALPO has claimed $2,944,476 for damages it has suffered due to the increased cost of the advertising it planned to accompany the national "rollout." However, it is difficult to see how ALPO can show it has in fact been damaged by this increase or that it has suffered in any way.

This Court credits Dr. Miller's methodology for computing the lost income stream and finds that his conclusions were reasonable and conservative. ALPO's actual damages have not been assessed based on a permanent foreclosure from the national puppy food market, but rather on a conservative three to five year delay. This Court finds that five years is the appropriate time period for measuring the damages

from delay. Five years is approximately the amount of time between the date the rollout would have occurred absent the CHD campaign and the remand hearing on damages in this case. This entire time period, in this Court's view, should be taken into account.[3]

Damages based on this five year delay amount to $4,507,961. This assessment is based primarily on ALPO's long-range strategic plan prepared in the ordinary course of business during the fall of 1985, immediately before the CHD campaign began. The documents reflecting this plan include actual results of sales volume and operating income for fiscal year 1985, and projections for the years 1986–1989. Losses were projected on ALPO Puppy Food for the years 1985–87, and starting in 1988, small profits were predicted. The pattern is not unusual for a new product.

Dr. Miller used these projected figures for the years until 1989, and then limited profits in the years following to the same level as in 1989—approximately $4 million. A reasonable ten percent discount factor was used to calculate present value. The value of the income stream, if delayed five years, was then computed, and the two figures compared. Thus, if the projected losses and profits did not begin until 1991 instead of 1986, the difference between the present value of the 1986 income stream and the 1991 income stream is $4,507,961.

This Court finds that ALPO is entitled to this amount. Ralston argues that the calculations proposed by Dr. Miller are incorrect because they do not account for ALPO's east coast sales. However, this Court finds that the income projections were based on the economies of scale and production which would result from national sales. The east coast marketing, taken alone, has in many ways been more expensive and more inefficient for ALPO. This was taken into account in calculating the income from the national rollout. Thus, this variable should not further affect the income stream calculations.

---

**3.** Had it not been for Ralston's CHD campaign, ALPO would not have been involved in this expensive and time-consuming litigation, which certainly has added to the delay in the possible rollout of ALPO Puppy Food.

Ralston next argues that the calculations fail to take into account income earned by ALPO from the alternative use of funds set aside for the rollout. This Court also finds that there is sufficient evidence that the money set aside by ALPO for the rollout did not generate further income for ALPO but was instead used to combat the CHD claims. Dr. Miller's testimony on this point is persuasive. Such use of these funds by ALPO was reasonable and necessary.

■ The Court finds that the information used to calculate the delayed income is reliable. It was, in fact, introduced at the first trial by Ralston, and was not influenced by this litigation in any way. Moreover, the Court finds that Dr. Miller's calculations were reasonable and conservative. Ralston's argument that different factors, such as the introduction of new products or other market variables, might have affected the projected income stream is rejected. Unlike the regression analyses discussed above, ALPO's projection of its income stream is a simple, concrete calculation based on the regular business practices of the company. There will always be some amount of uncertainty in projecting income loss. That is precisely what was meant by the Court of Appeals' admonition that the wrongdoer must bear the risk of uncertainty caused by the harm it created. ALPO is entitled to its full $4,507,961 claim for damages for delayed income stream.

*Enhancement Factor:*

■ Section 35(a) provides that the "district court may, in its discretion, enhance a damages award up to three times the sum found as actual damages 'according to the circumstances of the case.' " *Getty Petroleum Corp. v. Bartco Petroleum Corp.*, 858 F.2d 103 (2d Cir.1988) (*quoting*) 15 U.S.C. § 1117(a). In its initial opinion, this Court enhanced the damage award to ALPO because that figure did "not measure the full impact caused by Ralston's impermissible conduct." *ALPO*, 720 F.Supp. at 215. The Court of Appeals did not prohibit an enhancement in this case, but directed this Court, on remand, to "ex-

plain why the enhanced award is compensatory and not punitive." *ALPO*, 913 F.2d at 970. Because the enhancement awarded by the Court was not intended to punish Ralston, but to make the damages better reflect the true value of the actual harm done by its Lanham Act violation, an enhancement of the award against Ralston continues to be appropriate.

■ In determining whether an enhancement is appropriate under the circumstances of a particular case, "the court has a special duty ... to consider the question whether 'the amount of the recovery based on profits is either inadequate or excessive.' " *Stuart v. Collins*, 489 F.Supp. 827, 834 (S.D.N.Y.1980) (*quoting* 15 U.S.C. 1117). In other words, the statute recognizes, as did the Court of Appeals in this case, that the true damage to the plaintiff, although quite real and not speculative, may be difficult to quantify exactly. There is a danger, in some cases, "that verdicts based on prespecified formulations will do serious injustice in one direction or another." *Id.* In such a case the statute allows the Court to adjust the damages awarded "to make them consistent with the purposes of trademark law." *Id.*

In determining whether an award is adequate this Court considers three factors: the impact of the unlawful conduct directly upon the plaintiff competitor, the systemic distortion which the wrongdoer's conduct has upon the particular product market in which the plaintiff must compete in the future, and the costs incurred by the competitor in its efforts to mitigate its damages. Taking these three factors into account, in the present case, it is evident that a fifty percent (50%) enhancement of the "amount found" as actual damages more accurately reflects the true damage which Ralston's wrongdoing did to ALPO.

First, the harm directly to the plaintiff competitor in this case far exceeded the quantifiable damage to ALPO. The Court has recognized that, although the regression analysis indicated the CHD campaign to have been "above average" in its effectiveness, this analysis was not reliable enough to use to quantify lost profits.

Thus, although it is far from speculative that ALPO did, indeed, lose profits, the "amount found" as actual damages does not take that loss into account at all. Next, ALPO's damage award does not reflect any adjustment for inflation or prejudgment interest. While the Court does not choose to make these adjustments, *see infra*, these are nevertheless proper factors to be considered in deeming that the quantifiable damage award is not "adequate" to compensate ALPO. Finally, the damage done to ALPO from delaying its national rollout is not adequately reflected in the amount of quantifiable damages awarded. These damages were awarded based upon a five year delay in entering the market. They do not reflect the fact, however, that ALPO's chance to distribute nationally may well be destroyed forever. Ralston's wrongdoing had the direct effect, then, of depriving ALPO of a one-time chance to enter the national market at a time when it felt it was ready to compete on a national scale with Ralston. The fact that the chance to compete nationally may never come again can hardly be adequately reflected in a five year forecast.

Second, Ralston's wrongdoing harmed the entire marketplace to such a degree that the quantifiable damages are inadequate to compensate ALPO. In addition to the direct injury to ALPO, then, the CHD campaign had the affect of distorting for an indefinite period the dog food market in which ALPO competes.

As this Court said in its earlier opinion, Ralston's claim that its Puppy Chow would lessen the occurrence of canine hip dysplasia perpetrated a cruel hoax on the consuming public. The testimony showed that hip dysplasia is one of the most serious diseases to which dogs are subjected and one with no known cure. It was clear from the record in this case that dog owners would go to virtually any length to prevent their beloved pets from contracting this disease.

To dog owners, then, the CHD campaign was tantamount to an announcement by Ralston that Puppy Chow was the cure for "cancer." Dog owners could not conceivably resist purchasing a dog food for their beloved pets which they believed would help them avoid contracting this dreaded disease. Armed with this weapon, Ralston's claims acted like a sponge and literally soaked up the entire market. Ralston's wrongdoing, then, for a long period, altered the very nature of the market in which ALPO competes.

As noted above, ALPO may have forever lost the chance to compete in a nationwide market. Ralston's campaign, however, injured ALPO even beyond foreclosing that option. The CHD campaign was an affront to the market as a whole, cementing the dominance of a single company while permanently damaging the ability of any competitor or competitors to challenge for the lead position. ALPO's actual lost profits based upon this one instance of misconduct are clearly inadequate to account for this distortion of its market. Only by an enhancement can this Court hope to compensate ALPO for the damage to the marketplace in which it must compete.

Third, the actual "damages found" do not adequately compensate ALPO for the costs it incurred in attempting to end the wrongdoing of its competitor and restoring the integrity of its market. *See e.g. Friend v. H.A. Friend and Company*, 416 F.2d 526 (9th Cir.1969). Were it not for ALPO's efforts, Ralston's misconduct would not have been discovered. ALPO would have continued to suffer quantifiable and actual damages. Ralston had taken steps to conceal certain of its research that made it quite clear that its dog food formula simply did not work to prevent CHD. It was not until this litigation, through the outstanding investigative work performed by ALPO, that the failed tests came to light.[4] Ralston's entire record in

---

4. I note that I am not awarding ALPO attorneys' fees in this case. Such an award was prohibited by the Court of Appeals. Rather, in awarding an enhancement this Court is only taking into account as one factor the fact that the damage caused to ALPO in this case includes the costs of

its discovering that Ralston was making false claims concerning its dog food. Had it not made this discovery, it would not have been able to mitigate its own damage and even further damage to the market would have occurred.

this endeavor is not only one of wrongful conduct, but of repeated attempts to cover up that conduct once discovered. Thus, without ALPO's costly efforts to discover the false advertising of its competitor, ALPO would have continued to suffer even greater losses than it actually did. ALPO, then, deserves an enhancement to be compensated for these efforts to mitigate the damages to itself and the market as a whole.[5] An enhancement factor of fifty percent (50%), or $4,046,785.50, will therefore be applied.

*Adjustments of Damages:*

■ The parties have also claimed that their damages should be adjusted based upon inflation and interest. This Court sees no reason to apply an inflation adjustment to the damage awards to convert the awards from 1986 dollars to 1991 dollars. The Court also declines to make an award of prejudgment interest. These factors have been adequately taken into account as factors in the Court's decision to apply an enhancement factor in this case.

Based upon the above, the awards to the parties will be as follows. ALPO is entitled to $12,140,356.50, and Ralston will be entitled to $53,434.86.

*Attorneys' Fees:*

■ As discussed above, the Court of Appeals vacated this Court's award of attorneys' fees to ALPO, but did not disturb the award to Ralston. Accordingly, this Court must now calculate the amount of attorneys' fees that ALPO must pay. In the initial holding in this matter, this Court held that attorneys' fees would be limited to the costs of the prosecution of the successful aspects of the parties' case-in-chief. *ALPO,* 720 F.Supp. at 215. Ralston contends that it is entitled to $871,028 in attorneys' fees under this Court's ruling.

ALPO contests Ralston's demand, arguing that Ralston failed to properly document its attorneys' fees. According to ALPO, the amount of attorneys' fees for

which Ralston can accurately account is $12,963. This Court finds that Ralston's attorneys' fees are adequately accounted for. ALPO's objections lack the specificity required to dispute a calculation of fees, and accordingly, Ralston's fee petition will be granted except for that portion of the claim relating to the preparation of its fee petition of $73,468.

Ralston applied a three-step methodology to calculate the time attributable to its successful counterclaim. It first excluded $2,280,987 in legal fees which represented time clearly unrelated to Ralston's successful claim. Ralston then segregated the remaining legal fees into various subject matter categories based on the nature of the relationship with the successful claim. Ralston then estimated the percentage of time in each category which could fairly be attributed to a successful result. These calculations resulted in a total of near $704,570, 17.4% of the total $4,055,522 in legal fees billed by Sutherland, Asbill & Brennan in this litigation. Adding interest of $92,990 and the bill for the fee petition itself of $73,468, results in Ralston's fee petition for $871,028. The Court will award this amount less the portion applicable to its fee petition of $73,468 for the net award of $797,560.

ALPO does not contest the reasonableness of the hourly rates charged by Ralston's attorneys or the propriety of the charges for the various itemized legal expenses. Instead, ALPO contends that Ralston failed to document its claims accurately and instead relies on unfounded estimates. According to ALPO, the Court of Appeals' ruling that neither party is entitled to attorneys' fees under the Lanham Act suggests that any award to Ralston should be restrained to the minimum reasonable amount to accord with equitable considerations. Because "estimates" are not, in ALPO's estimation, reasonable, Ralston should receive only what can be concretely proved.

---

**5.** Applying the same factors to ALPO's conduct, the Court finds that the actual damages found do adequately reflect the damages which Ralston suffered. ALPO's violation was much more discreet than Ralston's and did not have the same types of longterm and wide ranging effects either on the market as a whole or on Ralston in particular. No enhancement factor will be applied to Ralston's award.

Courts have discretion to reduce an award of attorneys' fees based on inadequate documentation. *See, e.g., Hensley v. Eckerhart*, 461 U.S. 424, 433, 103 S.Ct. 1933, 1939, 76 L.Ed.2d 40 (1983); *National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319 (D.C.Cir. 1982). Ralston and its attorneys have kept extensive and detailed records of the work done in this litigation. ALPO's objection focuses on the means used to determine the percentage of these fees which should be awarded, and not on the underlying figures. Indeed, if ALPO's logic were followed to its conclusion, it would seem that this Court should exercise its discretion to supply its own method to calculate the correct percentage using Ralston's records. This the Court declines to do.

It is ALPO's burden to show that Ralston's demand is inaccurate or that it should be reduced or denied. A conclusory statement that Ralston's estimates are inappropriate is not enough to oppose the award. *See National Association of Concerned Veterans v. Secretary of Defense*, 675 F.2d 1319, 1337–8 (D.C.Cir.1982) (Tamm, J., concurring). ALPO has failed to propose a more appropriate manner for estimating Ralston's fees than that proposed by Ralston. It has failed to demonstrate that Ralston's proposed method inaccurately represents the amount of time expended on its successful claim.

Since ALPO has not proved that Ralston's fee request is unreasonable, this Court will award Ralston attorneys' fees in the amount of $797,560.

For all the reasons stated above, payment in the amounts set forth in this opinion are hereby awarded as follows: Judgment will be awarded in favor of ALPO in the amount of $12,140,356.50. Judgment will be entered in favor of Ralston in the amount of $850,994.86.

ORDERED.